Good morning, Your Honors. May it please the Court, my name is Hageet Alul. I'm with the law firm of Hughes Hubbard and Reed, and I represent the plaintiff appellant Stephanie Delzer on behalf of her two minor children. The appellants here are seeking Social Security survivor benefits based on the earnings of their deceased biological father, Owen Delzer. So this has been going on kind of a long time. How much money are they entitled to now? Aren't the kids about going to college? The kids I think are now about 16 years old, 17, 16 or 17 years old. The record doesn't contain the exact amount of money that they would be entitled to. That hasn't been calculated, but I think that it would be for them quite significant. Don't forget to speak up, would you please? I will. Thank you. I mean, if you want to be heard. I do want to be heard. Thank you, Your Honor. The narrow question presented here is whether the Delzer children are entitled to inherit under California Probate Code 249.5, where their father consented in writing to the use of his genetic material for posthumous conception and subsequently deposited sperm that was used to create embryos that resulted in their conception. The reason that California Probate Code is relevant is because, as Your Honors know, the Social Security Act incorporates state intestacy law and requires that an applicant be deemed a child entitled to inherit under state intestacy law. So given that Probate Code 249.5 is relevant, the particular provision at issue here is whether children who are posthumously conceived are entitled to inherit. Section 249.5 specifically addresses that scenario and sets out numerous criteria by which a posthumously conceived child is entitled to inherit. Those criteria are met here, and specifically the dispute is whether the decedent, in writing, specified that his or her genetic material shall be used for the posthumous conception of the child. So we have the embryos and then we have the sperm, too, right? We have the embryos and we have the sperm. So the embryos existed at the time he was still alive, right? Both existed at the time he was still alive. Right, all right. But one could argue, if they were to be treated differently, that the embryos, whatever your view is of life, that they were different than sperm that had not yet been mixed with an egg, right? And so that's kind of where all this comes down. I would agree that they're two separate objects, but I think it's important to back up and look at the timeline here, because Owen Delzer, on October 8th, executed this consent form. This is the consent form that the ALJ agreed gives consent for the posthumous conception, at least in her view, with respect to the embryos. At the time he executed the consent form, there was neither a deposit of sperm nor any embryos. So the consent form was executed in the context of the overall fertility treatment that was going to be implemented. Two weeks later, he deposits the sperm. Some of the sperm is used to develop these embryos, and some of the sperm is saved for later treatment. And unfortunately, those specific embryos, the Delzers went through the treatment. Those specific embryos did not result in a pregnancy, despite the Delzers' best intentions. And then Mr. Delzer is struck with a terminal illness. The question is, and this is a legal question, and this is a question that needs to be reviewed de novo, is does the fact that Mr. Delzer, in writing, gave his consent to the genetic material being used posthumously, satisfy 249.5, because he did not specify that it was his sperm that should be used, but rather specified that it was the embryos that was going to be used in that instance? Let me, okay, so it is de novo, but for legal issues, but it's deferential for factual issues. So I just want to give you the devil's advocate position on here, because it's a reviewing court. So the ultimate question in this case is whether the October 8th consent form meets the requirements of Section 249.5, right? Are we, we're together there. That it is clear and convincing evidence that Owen, in writing, specified that his genetic material shall be used for the posthumous conception of a child. So if the determination by the ALJ, which I think was also affirmed by the district court, that the October 8th consent form covers only the embryos and not the sperm, is a finding of fact, then the court would have to defer to the ALJ. Regardless of whether one would have decided the matter in the same way as the ALJ did, the decision arguably is reasonable and supported by financial, substantial evidence. So that's the hard argument against you. If there's a factual, if we have to defer on a factual issue, that makes it harder for you, right? That's correct, but our position is it's not a factual issue, because the ALJ specifically found that there was consent for posthumous conception, but that consent does not satisfy 249.5, because the decedent did not specify the type of genetic material that was ultimately used for the conception. And so our position is that that's not a factual issue. That's a question of what is the requirement of 249.5. 249.5 does not refer to embryos, does not refer to sperm or eggs, and it simply refers to genetic material to the extent there's any... For conception. For conception, that's correct. The question is what is conception. I'm not sure that there's a question in the statute... United with the egg has not conceived anything yet, right? I would agree with that, but, you know, to the extent that there's a suggestion here that the fertilized egg is conceived, I don't think that that's in the record established at all, and it's certainly not in California Probate Code. Say that again loudly, please. Yes, to the extent that there is a suggestion that a fertilized embryo is a conceived human being, I don't think that the record has established that. And it does appear that the ALJ was making a distinction between sperm and embryo on the basis of what the ALJ deemed to be ideological and moral grounds, but respectfully, neither the California Probate Code nor the factual record warrants any such distinction. And if you... Is there any reason to certify this to the California Supreme Court? Certainly this is a question of state law, and to the extent that the court finds... Would you like to argue in front of the California Supreme Court? I'd be delighted to argue in front of the California Supreme Court. And because I do view this as a question of legal interpretation, I can understand where the court's... But they've had a long time. You know, there's a whole basis for certification, and generally when we do certify something, we say, hey, this comes up all the time. You need to tell us what your law is on this. This statute's been around a while, and nothing... This is something like this hasn't ever happened. I would hazard a guess that this is an unusual scenario and that this probably is not likely to... You know, I can't say that it has never happened before or won't happen again, but certainly this is a fairly discrete subset of claimants under the Social Security Act. However, given that this is a question of interpretation of the California probate code, certainly the California Supreme Court is in a better position. Well, if we decided it, if it's strictly legal and we decided it, it's only binding in this case. It's not binding in all... It's not binding on California judges, you know, because there isn't anything really... As far as that goes. But if there's a factual determination, if we find it that way, then that makes it probably less attractive to the California Supreme Court. What are the parade of horribles that the... I don't know if I call them the government or the government. What would they say by virtue of granting benefits to your clients? You know, I... What sort of floodgate does this open? I understand that argument, and I don't think that in this case there is a floodgate because California law does contain a specific provision for the recognition of posthumously conceived children. We're not looking at creating a new right or recognizing a new class of children that would be subject to intestacy law. This is a different case from... For example, if we were under... The probate code 249.5 came into effect, I think it was in 2005 or 2006. If we were in the pre-2005 or 2006 landscape, I think that there would be an argument for a parade of horribles because there's unclear law and are these children entitled to recognition under California law. Here, California law is very clear. So you got the benefit of that law. We did. Yes, I mean that... Yes, we did get the benefit, and as the Social Security Act makes clear, we're entitled to the application of the more favorable law. But the law is narrowly defined. It does require a writing, which our position has been satisfied here. It does require that the writing only be revoked in writing, that specific consent. And it does require that the conception occur within two years. So this is not a situation where there's never going to be a settlement of estates or there's going to be just a broad stream of posthumously conceived children coming in. So I don't believe that there is a parade of horribles because I think this has been considered by the California legislature. Do you want to say something? I would like to, thank you. Can I ask one question? Sure, go ahead. I'll just give her time. You say that the deceased man granted a consent to use of genetic material. I see the forms referring to embryos. Could you tell me where the term genetic materials is used in the consent? Your Honor, the term genetic material is not used in the forms. It does refer to the embryos, but the embryos necessarily contain his genetic material. In an embryo, they contain egg and sperm. In an embryo. I had thought that you said that the consent was as to genetic materials, which would cover both. The statute refers to genetic material. Okay. And the legislative history, and I'm mindful I won't speak too long, but the legislative history specifically says Give me two minutes for rebuttal, so answer the question. We will not distinguish between types of genetic material, and it gives the example sperm, eggs, versus other types of genetic material, the implication being clearly there's other types of genetic material, such as embryos. So certainly, I think embryos fall within the category of genetic material that can be used for posthumous consent. And you would say sperm does also. Certainly. And is there any significance to the wording embryos I create with my wife? There is significance to that in the context that he is granting his wife the right to use those embryos. Well, there is no embryo until the ova and the sperm are put together. Yes, that's correct. But the California Probate Code 249.5 does require that the authorization for posthumous conception be granted towards a specific person. So it can't just be like I authorize anybody to use my ‑‑ well, I suppose in theory I could, but there is a requirement that notice be given to a specific person who has received that entitlement to use the genetic material posthumously conceived. And so the reference to with my wife satisfies the statute because it is giving her notice and the right to use that genetic material. Okay, I'll give you two minutes for rebuttal. Thank you, Your Honor. Thank you. Good morning. Good morning, Your Honor. Can you tell me what took so long on this case? Your Honor, this case has taken its time due to legal developments. For example, the Supreme Court's decision in Astrovi Kapato, which required the case to be returned to the administrative law judge. You have to speak up a little louder. I'm not hearing you. Sorry, Your Honor. There were legal developments that resulted in this case being returned to the district court level. The parties agreed that was the appropriate resolution. But wouldn't it start in 2001? Your Honor, that's correct. 2017? Yes, Your Honor. And the parties are here today following a series of steps that were both necessary and appropriate to reach the right outcome in this case. It required factual development below. It required the administrative law judge to carefully consider this evidence. It required the parties to go to the district court when the appellants filed lawsuit there. While that case was pending in the district court, as I mentioned, the Supreme Court issued the Astrovi Kapato decision, and the parties then agreed that it was appropriate for the case to be returned for further consideration by the agency. And following the outcome of those proceedings, the case was then in district court again, and the court issued its decision. The appellant appealed, and that's why we are here today. Sixteen years is a long time. It is, Your Honor, but it is necessary time. It's time well spent, and it's essential to get these issues right because this is an important matter not just for the Social Security Administration, but in the state of California. There are not many decisions construing Section 249.A. As this court noted when discussing this with my opponent, because there is so little guidance in the California court system on this provision, what this court decides today will in fact be quite significant and quite important. It will certainly affect subsequent agency decisions in similar contexts, and given the evolution of technology, the technological changes permitting posthumous conception, it is indeed quite possible, if not likely, that these scenarios will continue to arise with increasing frequency. So this is a matter that has lasting implications, and this court's ruling today is significant both for the state of California and for the Social Security Agency. It's not a terribly satisfactory result in this situation, but she's characterizing it, the appellant's lawyer, as a strict legal issue. Are you saying that there's a factual determination that we need to give factual, that we have to give deference to? Yes, Your Honor. The commissioner does submit that the administrative law judge's decision was supported by substantial evidence and based on the correct legal standards. But what factual determination was made? Specifically with respect to the consent agreements at issue here, executed in October of 1998, the administrative law judge concluded those agreements, by their terms, specifically concerned embryos. Those agreements did not address the disposition. The interpretation of agreements is a legal issue in California. Your Honor, looking at the type of genetic material specified in that agreement is a factual issue. And the type of genetic material my client submits in those agreements only concerned embryos. But that's a legal interpretation of the word. Your Honor, respectfully, embryos are quite distinct from sperm. This isn't a matter. As a matter of dictionary, right? Practically, legally, and as a matter of dictionary, Your Honor. These embryos weren't distinct from other sperm or other embryos. This is not a factual distinction between embryos of Mr. A and Mr. B or Mrs. C. The interpretation of contractual language in California, for a long time, has been solely a matter for the law, for the judge. Period. There is no factual determination that drives this case one way or the other, is there? Your Honor, respectfully, the Commissioner disagrees and argues that these agreements, by their terms, cover embryos. There is no further determination needed on what ---- Factual issue. That's a legal issue. It depends on the term, the meaning of the word embryo. Your Honor, even ---- They're not Mr. A's embryos and Mr. B's embryos being different. That's a factual determination. But the word embryo has a dictionary meaning or a usage meaning to be determined by the court as a matter of contractual interpretation. Does it not? Your Honor, as an additional factual matter that the administrative law judge found below, there are no agreements specifying, by their terms, what the disposition of Mr. Delser's cryopreserved sperm ---- You may find that the agreement is not specific enough to label the subject matter, right? That's a legal interpretation. Your Honor, there is no legal interpretation needed because the agreements are quite clear and quite specific about what they ---- Well, that's fine. That's a legal ---- Take a look at Section 1635 of the Civil Code of California, the plain meaning rule, right? But that's a legal rule that's adopted in California to the determination of the meaning of documents, written contracts. I mean, what factual issue did the ALJ find? The ALJ found ---- As a factual issue. That's in dispute. I mean, there's no question these are Mr. Delser's genetic material. There's no factual issue there. Your Honor, the ALJ found that review of the evidence in the record, including the testimony by Mr. Delser, the will that Mr. Delser executed, the statements by Dr. Lee, their fertility specialist, did not evidence any intent by Mr. Delser for the posthumous conception of the children using his cryopreserved sperm. Because there was no clear and convincing evidence of specific designation, right? There was no written ---- There was no signed writing evidencing by clearing ---- By clear and convincing evidence. Okay. Let's say what he signed, what the deceased signed, if these children had been conceived by way of embryo, would they be entitled to benefits? Those facts are not before the Court, Your Honor. Well, I'm asking ---- It's a hypothetical. Yes, Your Honor. It's a hypothetical. We do it all the time. Yes, Your Honor. If the children were born from the embryo ---- There were embryos. Were there embryos? Yes. Yes. If the embryos that were created during Mr. Delser's lifetime resulted in the birth of children ---- Within two years. Or whatever. But the written agreement would have covered that. Yes, Your Honor. Now, where does the written agreement say that the embryo has to be created prior to the donor's death? An embryo is an embryo, and they didn't simply utilize the sperm. They made an embryo after he had died. Now, where does it say that that wouldn't count? The issue is whether Mr. Delser signed a consent form indicating that his sperm ---- with embryos that my wife and I created. Now, they didn't get a Petri dish and put the ovum and the ---- or the ova and the sperm together in that Petri dish and create an embryo. The doctor did that, just like he did the one subsequent to Mr. Delser's death. Isn't that correct? That's incorrect, Your Honor, because ---- Well, let me take a step back. I apologize. What we have here are embryos created during Mr. Delser's lifetime pursuant to a consent form that he executed. Well, it doesn't say during his lifetime. It says embryos created by my wife and I. It doesn't say during my lifetime. And if it's going to be posthumously permitted, then what difference does it make whether it's created with a sperm and an ova after he dies or a sperm and an ova before he dies? It's an embryo made by he and his wife. Your Honor, the difference is that Mr. Delser's sperm is ---- the cryopreserved sperm is the material that was used to create the embryos after his death. Right, but it was an embryo that was created. It was not just utilizing the sperm on the wife. Correct. There is no clear and convincing signed writing by Mr. Delser stating that the cryopreserved sperm could be used for that purpose versus the sperm ---- Well, the sperm was used to create an embryo. So where is it in the consent? Where does it say that you can't create an embryo after I die? The whole purpose of doing it was to have a posthumous child. Your Honor, going back to the language of the statute, these sort of inferences and because something is not written, therefore we should assume the opposite is true, is simply not what the statute requires. The statute requires affirmative evidence that Mr. Delser agreed that his sperm could be ---- his cryopreserved sperm could be used after his death. So if it's that important, why shouldn't the California Supreme Court tell us what that law means? Your Honor, it certainly would be reasonable for ---- And then we can go up to 20 years. Your Honor, that is a possibility if this Court does decide to go that route. It would certainly be a question that would be reasonable ---- And you would concede if the California Supreme Court saw it the way that they saw it, then you would have to follow that. If they said that that's what the law means and that's what this ---- if they decided the case that way, then we are not free to disregard that. We would want to see that ruling, of course, before agreeing, but that is certainly possible, Your Honor. Oh, that you wouldn't agree with the California Supreme Court? We would agree with the California Supreme Court. I have to agree with the U.S. Supreme Court, and if it's on State law, I've got to agree with the California Supreme Court. I don't get to put my two cents in after that. I can do all I want beforehand. Yes, Your Honor. So if this Court elects that that's the appropriate avenue for this case, the Commissioner certainly would not disagree with that, if the Court wanted to certify it to the California Supreme Court. But returning to the statute at issue here, 249.5a, it requires to reiterate clear and convincing evidence in writing of Mr. Delzer's intention that the cryopreserved sperm shall be used for the posthumous conception of his children. We do not have documentation stating any such intention. Okay. So let's – okay. The language of the statute is – all right. Let's go with the language of the statute, and let's just put it side by side with the language of his consent form. So the language of the statute says that it's clear and convincing evidence in writing specified that his genetic material shall be used for the posthumous conception of a child, right? Yes. So in genetic material, we don't really have too much in the way of definitions. Correct. So – but we're not really disputing that these things are all genetic material of some sort, but that being the case, then what the consent form that he did do in writing, what does that say? That concerns the disposition of embryos. What are the exact words? Can you read it to me? Tell me the date. At page 170 of the record, the patient information and informed consent form addresses disposition of embryos and states that the options include cryopreservation for your own future use. A separate cryopreservation consent is required. That's the relevant provision here. The addendum is where the separate consent was provided for the disposition of the embryos that were cryopreserved after not being used immediately. And what does that say? The addendum to the consent – the addendum states at page 172 disposition of embryos. Choose one of the following options regarding remaining embryos or oocytes. The third option was selected here, which states cryopreserve and store for future transfer. We understand that for this option to be implemented, we must read, understand, and sign the cryopreservation consent form, and that we will be financially responsible for the cryopreservation and the storage fees. Okay, now at that time that he did the written consent, what material existed? The sperm? When the consent forms were executed, it is our understanding that no sperm had been collected yet, nor embryos had been created yet. That was to follow execution of these documents. Okay, and then did he do more than one sperm deposit, or was it just one, and then they used it for some embryos that didn't work, and then the doctor created – then they did another – he made other ones after, right?  Two vials were cryopreserved. The remaining sperm was used for the creation of embryos, all of which were then transferred to Ms. Delzer but did not result in a successful pregnancy. The cryopreserved sperm – for the cryopreserved sperm, there is no specific documentation executed by Mr. Delzer stating his intention for what would happen to that sperm after he died, and that's the commissioner's position, is that the absence of such documentation necessarily does not satisfy the strict requirements of Section 249.A, which requires clear and convincing evidence in a signed writing. Okay, and then – but at the time that they signed the writing, this statute didn't exist, right? That's correct, Your Honor. Okay. Is it your position that Mr. Delzer wanted all sperm that had not been used for the creation of embryos after his death to be discarded? Your Honor, the commissioner simply does not know what Mr. Delzer's intentions were. No one does, and that's the fundamental problem here. There must be clear and convincing evidence of his intentions. We don't have clear and convincing evidence in writing of what he intended to happen to that material. Well, as I read the consent here, the destruction of the embryos was to take place only in the event of the death of both of us, so destruction was not an option that he specifically provided for. I'm not quite sure how you answered Judge Kelly's question. Where does the agreement say the embryos had to be created before his death? Your Honor, the forms do not state the embryos needed to be created before his death, but what the problem here is is that there is no provision permitting the creation of additional embryos using the cryopreserved sperm because Mr. Delzer didn't... You say that the statute requires an affirmative statement in writing by clear and convincing evidence that his sperm could be used for the creation of embryos after his death. Yes, Your Honor. That's what the statute requires, and as the Administrative Lodges found and as the District Court agreed, there is no signed writing in the record here providing clear and convincing evidence that Mr. Delzer intended for his cryopreserved sperm to be used to posthumously create children, and the absence of that documentation requires that this matter, that the Commissioner's decision be affirmed. All right, but now the doctor made some statements. There's some testimony from the doctors. Now, would we only get to those if it's ambiguous what the written release said? If there is contract ambiguity, yes. Extrinsic evidence may be considered to see if the alternative evidence provides... Okay, and so then what did the doctor say? The doctor said he believed that Mrs. Delzer's wish to conceive children following Mr. Delzer's passing using the cryopreserved sperm was consistent with his recollections of when the Delzers initially approached him, went to his clinic for in vitro fertilization treatments. So did the ALJ not believe that and make a factual finding against that, or what was the... The ALJ found Dr. Lee's testimony too speculative to constitute clear and convincing evidence. First, because... So is that a factual finding? We submit that it is a factual finding, subject to deference, Your Honor. The administrative logic pointed out that while it may have been consistent with their intentions at the time they first approached him, it does not, this testimony does not speak to Mr. Delzer's specific intentions regarding the disposition of his cryopreserved sperm after his death. Okay. Did anyone have any... We've gone over the time, but we had questions, so thank you. Thank you. Thank you, Your Honor. I have just a few points I'd like to make on rebuttal. One, quickly, to the point of the length of time, it is correct that there was agreement to remand this matter back to the ALJ after Caputa. I was involved in that, and frankly, we were quite reluctant to do so, but the district court did encourage that and put the matter on a six-month review schedule, and so that is how we ended up back at the ALJ. But effectively, the ALJ's position and counsel's position is that the consent here is both too specific because it refers to embryo and not specific enough because it doesn't refer to sperm. And quite honestly, that puts our client in an impossible situation. We are sitting here at a time where they are before the statute was enacted. They clearly intended to have children using IVF, and they expressed their intent to have children posthumously using IVF. And to quibble that that consent concerns only the embryo but not the precursor to the embryo, the genetic material being the embryo but not the precursor, the sperm that was used to create the embryo, I think is just not a fair distinction. And counselors said that, well, legally, embryos and sperm are distinct. I have not seen anything in the record to suggest that California probate law treats sperm and embryos legally as distinct for this purpose, and in fact, the legislative history is quite to the contrary, where it says, well, we're focusing on the intent of the decedent, and therefore we're specifically not defining the term genetic material to refer specifically to gametes or other genetic material. With respect to counselors' position that there is no intent that the sperm, the cryopreserved sperm, be used posthumously, respectfully, that's incorrect. Mr. Delzer executed a will. That will granted all his property to his wife. That property includes the sperm. So that sperm was granted to his wife. Did they talk about the sperm in his will? They don't talk about the sperm in his will. No, they don't talk about the sperm, but it's property like any other property, so it's given to his wife for her to do as she wants. So I don't think that it's a fair characterization to say that we have no understanding of what his intent was with respect to his property, which includes that sperm, particularly where we're in the situation where we know that he had agreed to posthumous conception. And since we're getting to the question of the ALJ and fact-finding, the ALJ did discredit Dr. Lee's testimony, finding it speculative. Frankly, with all due respect, the ALJ itself was being speculative in reaching certain factual conclusions. Mr. Delzer, after he was diagnosed with a terminal illness, went to deposit more sperm. This was not a man under any illusion that he was going to survive. He was told that he had six months left to live. He's a 40-year-old man with six months left to live. Actually hands up's the coming in three months. He goes to deposit sperm. Why? Not because he's actually thinking he's going to recover. He's terminal. There's no two ways about it. He goes to deposit sperm. The ALJ finds, no, that's not intent that he intended to posthumously conceive because maybe he changed his mind when he was in the room going to deposit sperm and didn't tell anyone. There's nothing in the record to support that. So I think everything in the record supports that this was a deliberate choice to first create children through in vitro fertilization, have those children posthumously, and then when faced with the unfortunate mortality that Mr. Delzer was faced with, to then take a step further and agree to have these children posthumously. All right. Thank you very much. That concludes argument in this. This court will stand in recess until tomorrow at 845. Thanks to both counsel for a great argument. Thank you. That was very helpful.
judges: Kelly, Callahan, Bea